(241 P.3d 120)
No. 100,167

STATE OF KANSAS, *Appellee*, v. MICHAEL LORENZO KNIGHT, JR., *Appellant*.

Original opinion filed November 6, 2009. Modified opinion filed October 8, 2010.

*Carl Folsom, III*, Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant district attorney, *Sara Pfeiffer*, legal intern, *Stephen M. Howe*, district attorney, and *Steve Six*, attorney general, for appellee.

Before GREENE, P. J., GREEN and STANDRIDGE, JJ.

GREEN, J.: On September 10, 2010, our Supreme Court granted appellant's petition for review and summarily remanded this appeal to the Court of Appeals for consideration of the United States Supreme Court's recent decision in *McDonald v. Chicago*, 561

U.S. 742, 177 L. Ed. 2d 894, 130 S. Ct. 3020 (2010), which found that the Second Amendment right to keep and bear arms is fully applicable to the states by virtue of the Fourteenth Amendment to the United States Constitution.

In our original opinion *State v. Knight*, 42 Kan. App. 2d 893, 218 P.3d 1177 (2009), on page 894, Syl. ¶ 11, stated: "The Second Amendment to the United States Constitution is not incorporated to the Due Process Clause of the 14th Amendment to the United States Constitution and thereby enforceable against the states."

The previously quoted syllabus is modified to read: "The Second Amendment to the United States Constitution is incorporated in the Due Process Clause of the 14th Amendment to the United States Constitution and thereby enforceable against the states."

We delete the following paragraph on page 910 of our original opinion:

"Indeed, the *Heller* Court states that *Presser* and *Miller* 'reaffirmed that the Second Amendment applies only to the Federal Government.' 128 S. Ct. at 2813 n.23. As a result, until the Supreme Court overrules *Presser* and holds to the contrary, lower courts remain bound to follow the law that the Second Amendment has no application to the states. Because the Second Amendment is not incorporated in the Due Process Clause and thereby enforceable against the states, Knight cannot maintain that K.S.A. 2006 Supp. 21-4301(a)(4) infringes on any Second Amendment rights."

We replace the previously deleted paragraph of our original opinion with the following paragraph:

"Nevertheless, the United States Supreme Court recently held that the right to 'keep and bear arms' embodied in the Second Amendment applies not only to the federal government, but also to the individual states. See *McDonald v. Chicago*, 561 U.S. 742, 177 L. Ed. 2d 894, 130 S. Ct. 3020 (2010). A four-justice plurality agreed that the Due Process Clause of the 14th Amendment to the United States Constitution 'incorporates' the Second Amendment's right to keep and bear arms, which was recognized in *District of Columbia v. Heller*, 554 U.S. 570, 171 L. Ed. 2d 637, 128 S. Ct. 2783 (2008)."

We delete the following paragraph on page 910 of our original opinion:

"Nonetheless, Knight contends that even if the court finds that the Second Amendment does not apply to the states, § 4 of the Kansas Constitution Bill of

Rights offers the same protection as the Second Amendment. Kansas case law, however, clearly proves that the regulations against carrying concealed weapons are not in violation of § 4 of the Kansas Constitution Bill of Rights. See *Salina v. Blaksley*, 72 Kan. 230, 83 Pac. 619 (1950) (ruling that § 4 of the Kansas Constitution does not confer an individual right to bear arms); *State v. Doile*, 7 Kan. App. 2d 722, 725, 648 P.2d 262, *rev. denied* 232 Kan. 876 (1982) (noting a 'legislative interest in controlling concealed weapons'). As a result, Knight's argument fails."

We adhere to the original opinion in all other respects.

Michael Lorenzo Knight, Jr., appeals his convictions after a bench trial for criminal possession of a firearm and carrying a concealed firearm. On appeal, Knight contends that the trial court improperly denied his motion to suppress evidence arising from a car stop. We disagree and affirm. Knight also asserts that his conviction for criminal possession of a firearm is inappropriate, because the statute, K.S.A. 21-4204(a)(4)(A), under which he was convicted does not apply to his prior felony for an attempt crime. We agree. Accordingly, we reverse and remand with directions to dismiss this conviction. Knight further maintains that his conviction for carrying a concealed firearm violates his constitutional right to bear arms. We disagree and affirm. Finally, Knight contends that the trial court erred in ordering him to reimburse the Board of Indigents' Defense Services for attorney fees without first considering his ability to pay the fees and determining the financial burden that payment of these fees would impose on him. We agree. Accordingly, we vacate the trial court's imposition of attorney fees against Knight and remand for further consideration of this matter.

In October 2007, Knight was charged with misdemeanor carrying of a firearm in violation of K.S.A. 21-4201 and felony possession of a firearm in violation of K.S.A. 21-4204(a)(4). The felony possession of a firearm charge was based on Knight's prior conviction of attempted possession of cocaine.

Before trial, Knight moved to suppress evidence seized from the traffic stop. During the hearing on the motion, Kansas Highway Patrol Trooper Davon Brame testified that at approximately 11:24 p.m. on a summer night, he saw Knight driving a maroon Chevy Monte Carlo southbound on I-35 in Johnson County, Kansas.

Brame noticed that Knight was unable to keep his car within its proper lane of travel. The car crossed approximately 3 feet over the line separating the left lane of the highway from the shoulder. While following him, Brame also witnessed Knight weave within his proper lane of travel two or three times. Additionally, Knight crossed approximately 1 foot over the dotted line on the right side of the lane. After following Knight for approximately ½ mile, Brame initiated a traffic stop based upon Knight's inability to maintain a single lane of travel. Brame also testified that, as he walked up to the stopped car, he thought Knight was intoxicated.

At the conclusion of the hearing, the trial court denied Knight's motion to suppress. The court found that, independent of Brame's suspicion that Knight was driving while intoxicated, Knight had committed actual traffic infractions sufficient to justify Brame's stop. After Knight's motion to suppress was denied, he moved the trial court to reconsider its decision based on this court's recent holding in *State v. Ross*, 37 Kan. App. 2d 126, 149 P.2d 876, *rev. denied* 284 Kan. 950 (2007).

At the hearing on the motion to reconsider, Brame was again called to testify. Brame's testimony was substantially similar to the testimony he gave at the suppression hearing, with a few exceptions. Brame noted that there were no parked cars on the shoulder when Knight crossed onto it and that the shoulder was paved. Brame further stated that there were no cars in the lane to the right of Knight when he crossed over the dotted line on the right side of the left lane. He also characterized the traffic flow as "light" as he followed Knight. Brame again acknowledged, as he had in his prior suppression hearing testimony, that his justification for stopping Knight was because Knight had failed to maintain a single lane of travel.

When questioned about his in-car video camera, Brame stated that he had not activated it until after he initially noticed Knight was unable to maintain a single lane of travel. During the hearing, the video tape of Knight's alleged infractions was shown. After viewing the tape, Brame acknowledged that Knight's initial failure to maintain a single lane of travel, when he drove over the left solid line on to the shoulder from the left lane, was not recorded on the

video tape. Brame stated that he had not turned on the video camera until after that alleged infraction had occurred.

After viewing the video tape in court, Brame changed his testimony slightly. Brame acknowledged that although Knight had not stayed in the left lane, Knight had used his turn signal and had moved into the center lane. After he entered the center lane, Knight crossed the left dotted line once. The tires of Knight's car also touched the dotted line on the right side of the center lane. Brame considered this to be a failure to maintain a single lane of travel. Overall, Brame saw Knight drive over the left or right lane markers five times.

During this reconsideration hearing, Brame stated that he suspected Knight "was either intoxicated or a sleepy driver."

At the conclusion of the hearing, the trial court denied the motion to reconsider. The court distinguished *Ross* from the facts in this case, concluding that *Ross* did not apply because Trooper Brame testified that he stopped Knight's car to determine if Knight was intoxicated. This fact was absent in *Ross*.

At the bench trial, both parties agreed to a set of stipulated facts. Among the stipulated facts were the following:

"1. On August 12, 2006 Trooper Brame viewed a Maroon Chevy Monte Carlo driving on I-35 at around 11:24 p.m. in Johnson County, Kansas.

"2. Trooper Brame testified that he saw the vehicle operated by the Defendant cross the solid line on the left side of I-35 and weave within its own lane.

"3. Trooper Brame testified that he believed that the driver of the Monte Carlo may be under the influence of drugs and/or alcohol.

"4. Trooper Brame activated his emergency lights and pulled over the Monte Carlo in Johnson County, Kansas."

Knight also stipulated to possessing the handgun discovered by Brame during the stop. At the conclusion of the bench trial, the court found Knight guilty of carrying of a concealed firearm, a misdemeanor, and possession of a firearm, a felony.

At the sentencing hearing, the court inquired about the public defenders' fee. Knight's counsel told the court that the fee was $625. The trial court then asked Knight when he could start paying the fee back and how much he could pay. Knight's counsel told the court that Knight could pay "$50 a month starting March 1st."

The court replied that Knight would "obviously . . . have to double up on that probably somewhere along the way." The court made no further inquiry into Knight's ability to pay the fee or as to any burden it might place on him.

## DID THE TRIAL COURT ERR IN DENYING KNIGHT'S MOTION TO SUPPRESS EVIDENCE SEIZED DURING THE CAR STOP?

On appeal, Knight contends that Trooper Brame acted unlawfully in stopping his car because Brame did not have sufficient reasonable suspicion to justify the stop of Knight's car.

An appellate court reviews the trial court's decision on a motion to suppress evidence using a bifurcated standard. Without reweighing the evidence, the trial court's findings are reviewed to determine whether they are supported by substantial competent evidence. Then the ultimate legal conclusion regarding the suppression of evidence is reviewed using a de novo standard. *State v. Woolverton*, 284 Kan. 59, 70, 159 P.3d 985 (2007).

Nevertheless, when the material facts to a trial court's decision on a motion to suppress evidence are not in dispute, the question of whether to suppress is a question of law over which an appellate court has unlimited review. *State v. Fitzgerald*, 286 Kan. 1124, 1126, 192 P.3d 171 (2008).

Under the Fourth Amendment to the United States Constitution, a traffic stop is considered a seizure. According to *Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968), and as codified in K.S.A. 22-2402(1), a police officer must have a reasonable suspicion based on articulable facts to stop a moving vehicle. *Martin v. Kansas Dept. of Revenue*, 285 Kan. 625, 636, 176 P.3d 938 (2008).

Our Supreme Court explained in *State v. Toothman*, 267 Kan. 412, Syl. ¶ 4, 985 P.2d 701 (1999), the role of the appellate court in reviewing whether a stop is justified by reasonable suspicion:

"When evaluating reasonable suspicion, we judge an officer's conduct in light of common sense and ordinary human experience. Our task is not to pigeonhole each purported fact as either consistent with innocent travel or manifestly suspicious, but to determine whether the totality of the circumstances justify the de-

tention. We make our determination with deference to a trained law enforcement officer's ability to distinguish between innocent and suspicious circumstances, remembering that reasonable suspicion represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence."

The State bears the burden of proof for a suppression motion and must prove to the trial court the lawfulness of the search and seizure. *State v. Ibarra*, 282 Kan. 530, 533, 147 P.3d 842 (2006).

K.S.A. 8-1522 applies "[w]henever any roadway has been divided into two (2) or more clearly marked lanes for traffic." K.S.A. 8-1522(a) requires that "[a] vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from such lane until the driver has first ascertained that such movement can be made with safety."

Knight argues that the State must prove his crossing of the highway line was done at a time when it was unsafe to do so. Knight cites *Ross* in support of his position. In *Ross*, a motorist was driving on the highway when he briefly crossed over the fog line. He was later stopped by a police officer for a violation of K.S.A. 8-1522(a). In ruling that the stop was illegal, the *Ross* court stated that "in articulating reasonable suspicion that a traffic offense has occurred in order to justify the traffic stop, the totality of the circumstances must make it appear to the officer that not only did the defendant's vehicle move from its lane of travel, but it left its lane when it was not safe to do so." 37 Kan. App. 2d at 130. The facts in *Ross* showed that the shoulder of the highway was paved, there were no objects or hazards on the shoulder posing a danger, the fog line was only briefly crossed once, there was no other weaving by the car, and the officer did not testify that he was concerned that the driver was sleepy or intoxicated. Based on those facts, the *Ross* court found that the officer did not have reasonable suspicion to warrant a traffic stop. 37 Kan. App. 2d at 131.

The State, on the other hand, argues that the facts of *Ross* are distinguishable from the facts in this case. The State points out that the failure to maintain a single lane of travel was the officer's only justification for a traffic stop in *Ross*. The State, however, notes that that situation is different from this case because Brame also

suspected Knight of driving while intoxicated or sleepy. Furthermore, the State notes that the facts of *Ross* showed only one instance which could have been considered a single-lane violation. On the other hand, the State asserts that Knight failed to maintain his proper lane of travel several times and was also weaving within his lane of travel.

Most recently, in *State v. Marx*, 289 Kan. 657, 673, 215 P.3d 601 (2009), our Supreme Court interpreted

"K.S.A. 8-1522(a) as establishing two separate rules of the road. The first requires a driver to keep entirely within a single lane while traveling on a roadway with two or more clearly marked lanes. That rule is temporarily suspended when it becomes impracticable to stay within the lane markers and when the driver is properly effecting a lane change. Proof that driving outside the lane markers created no safety hazard is not a defense to the single lane rule. The second rule provides that before a driver may change lanes or move from the current lane of travel to another location, he or she must ascertain that the movement can be made with safety. A traffic infraction occurs under K.S.A. 8-1522(a) when either rule of the road is violated."

Moreover, the *Marx* court determined that K.S.A. 8-1522(a) "only requires compliance with the single lane rule as nearly as practicable, *i.e.*, compliance that is close to that which is feasible. The statutory language tells us that a violation of K.S.A. 8-1522(a) requires more than an incidental and minimal lane breach." 289 Kan. at 674. Most significantly, in *Marx*, our Supreme Court held that the State had failed to carry its burden of showing that the officer making the stop had a reasonable suspicion that the vehicle's driver had violated K.S.A. 8-1522(a). Indeed, the court stated that the officer furnished "no testimony from which the court could even infer that it was practicable to maintain a single lane [of travel]." 289 Kan. at 676.

Like *Marx*, this case presents an example of negative proof. There were two possibilities: Knight violated the single-lane rule (K.S.A. 8-1522[a]) or he did not violate the single-lane rule. Negative proof requires the proponent, in this case the State, to show the absence of any other possibility other than the State's claim that Knight had violated the single-lane rule. Here, the State failed to carry its burden of proof to eliminate the other possibility: that

Knight did not violate the single-lane rule. For example, the State failed to meet *Marx*'s second rule: the introduction of evidence showing that it was unsafe for Knight to leave his lane of travel. Most significantly, the trial court declared that Knight had not violated K.S.A. 8-1522(a) under the *Ross* holding: "I wholeheartedly agree that the movement of the vehicle itself pursuant to the *Ross* holding doesn't show an infraction occurred."

Moreover, based on Trooper Brame's testimony and on the stipulation that the stop was based on Knight's car "cross[ing] the solid line on the left side of I-35 and weav[ing] within its own lane," the State has failed to carry its burden to show that Knight did not maintain a single lane of travel despite the fact that it was practicable to do so. This was a failure of proof under *Marx*'s first rule. As a result, the State failed to carry its burden to show that Trooper Brame had a reasonable suspicion that Knight was violating the provisions of K.S.A. 8-1522(a) with his car.

Nonetheless, citing two cases from our Supreme Court, the State argues that Trooper Brame's observation of Knight's car weaving within its own lane of travel would furnish reasonable suspicion justifying a temporary investigative stop. First, in *State v. Field*, 252 Kan. 657, 658, 847 P.2d 1280 (1993), an officer pulled over a motorist who had been weaving within his lane of travel several times. The officer pointed out that it was approximately 2 o'clock in the morning when he noticed the motorist's car weaving. Although the evidence showed that the motorist had not committed a traffic violation, our Supreme Court explained that a traffic violation was not required to justify a stop:

"There is no requirement that the officer actually observe a traffic violation being committed. As indicated by the other cases cited herein, the repeated weaving of a vehicle within its own lane may constitute reasonable suspicion for an officer to stop and investigate the driver of the vehicle." 252 Kan. at 664.

As a result, the *Field* court concluded that the officer had "clearly shown articulable facts sufficient to constitute reasonable suspicion" of driving under the influence. 252 Kan. at 664.

Second, in *State v. Hopper*, 260 Kan. 66, 67, 917 P.2d 872 (1996), a motorist drove over a centerline multiple times and

weaved within his lane during adverse weather conditions before he was stopped by an officer. The *Hopper* court found reasonable suspicion that a violation of K.S.A. 8-1514(a), failure to drive on the right half of the roadway, had occurred. 260 Kan. at 73. This case is distinguishable from the present case because the *Hopper* court determined that the traffic infraction furnished the necessary reasonable suspicion for the stop.

Trooper Brame's decision to stop Knight's car was arguably based on two factors: (1) the time of day—11:24 p.m. and (2) the driver's driving over the left or right lane markers several times. As stated earlier, these same factors have supported a finding of reasonable suspicion. As the State points out, the time (late night) combined with Knight weaving in and out of lanes without signaling and weaving within his proper lane of travel a number of times justified a temporary investigative stop.

Consequently, Trooper Brame, as the State maintains, had an independent basis for reasonable suspicion other than the alleged K.S.A. 8-1522(a) violation. Although Brame testified inconsistently regarding his justification for stopping Knight, twice stating it was for a failure to maintain a single lane and once stating it was for suspected driving while intoxicated, Brame did consistently state that he was concerned Knight was either intoxicated or sleepy.

Moreover, the trial court determined that Trooper Brame was justified in stopping Knight's car to determine if Knight was intoxicated. As a result, Trooper Brame's observation of Knight's car weaving in and out of lanes without signaling and his car's weaving within its proper lane of travel, standing alone, created sufficient reasonable suspicion for Trooper Brame to believe that Knight was driving while intoxicated or sleepy, which justified a temporary investigative stop. For this reason, Knight's argument fails.

### DOES CRIMINAL POSSESSION OF A FIREARM UNDER K.S.A. 21-4204(a)(4)(A) APPLY TO PRIOR CONVICTIONS OF ATTEMPT CRIMES?

Knight also contends that his conviction under K.S.A. 21-4204(a)(4)(A) for criminal possession of a firearm was inappropriate. Knight states that his prior felony conviction for attempted

possession of cocaine is not specifically enumerated in K.S.A. 21-4204(a)(4)(A), and therefore, he was not prohibited from possessing a firearm.

Interpretation of a statute is a question of law over which this court has unlimited review. *State v. Jefferson*, 287 Kan. 28, 33, 194 P.3d 557 (2008).

The first task of an appellate court is to " 'ascertain the legislature's intent through the statutory language it employs, giving ordinary words their ordinary meaning.' [Citation omitted.]" *State v. Gracey*, 288 Kan. 252, 257, 200 P.3d 1275 (2009).

" 'When a statute is plain and unambiguous, we do not speculate as to the legislative intent behind it and will not read the statute to add something not readily found in it. We need not resort to statutory construction. It is only if the statute's language or text is unclear or ambiguous that we move to the next analytical step, applying canons of construction or relying on legislative history construing the statute to effect the legislature's intent.' [Citation omitted.]" *Double M Constr. v. Kansas Corporation Comm'n*, 288 Kan. 268, 271-72, 202 P.3d 7 (2009).

" 'Errors plainly clerical in character, mere inadvertences of terminology, and other similar inaccuracies or deficiencies will be disregarded or corrected where the intention of the legislature is plain and unmistakable. But the court cannot delete vital provisions or supply vital omissions in a statute. No matter what the legislature may have really intended to do, *if it did not in fact do it, under any reasonable interpretation of the language used,* the defect is one which the legislature alone can correct.' [Citation omitted.]" *Kenyon v. Kansas Power & Light Co.*, 254 Kan. 287, 292-93, 864 P.2d 1161 (1993).

"As a general rule, criminal statutes must be strictly construed in favor of the accused. Any reasonable doubt as to the meaning of the statute is decided in favor of the accused. This rule of strict construction is nevertheless subordinate to the rule that judicial interpretation must be reasonable and sensible to effect legislative design and intent. [Citation omitted.]" *Gracey*, 288 Kan. at 257-58.

K.S.A. 21-4204(a) states:

"Criminal possession of a firearm is:

. . . .

(3) possession of any firearm by a person who, within the preceding five years has been convicted of a felony, other than those specified in subsection (a)(4)(A)

. . .

(4) possession of any firearm by a person who, within the preceding 10 years, has been convicted of: (A) A felony under K.S.A. 2008 Supp. 65-4160 . . . ."

Knight first argues that, although K.S.A. 21-4204(a)(4)(A) criminalizes possession of a firearm if a person has been convicted of K.S.A. 2008 Supp. 65-4160 for possession of cocaine, the statute is silent with regard to convictions of attempt crimes, including attempted possession of cocaine. K.S.A. 21-4204(a)(4)(A) does not include K.S.A. 21-3301 (the attempt statute) in the list of applicable felonies, nor does it state that attempts of the enumerated felonies qualify for inclusion. Knight points out that a different subsection, K.S.A. 21-4204(a)(3), serves as a " 'catch-all' " provision and applies to all crimes not specifically enumerated in K.S.A. 21-4204(a)(4). Knight argues that attempt crimes should fall under this " 'catch-all' " provision.

On the other hand, the State maintains that K.S.A. 21-4204(a)(4)(A) "only requires a conviction under one of the enumerated offenses, not a conviction of the offense." The State argues that Knight's prior conviction for attempted possession of cocaine was a conviction under both the attempt statute, K.S.A. 21-3301, and the possession of cocaine statute, K.S.A. 2008 Supp. 65-4160(a). The State contends that although Knight was not convicted *of* K.S.A. 2008 Supp. 65-4160(a), he was convicted of a crime *under* K.S.A. 2008 Supp. 65-4160(a). To support this contention, the State maintains that every attempt crime must have an underlying crime. Under this reasoning, Knight's conviction for attempted possession of cocaine would have the underlying crime of possession of cocaine.

Additionally, the State relies on K.S.A. 21-3107(2)(c) for the statement that "an attempt to commit the crime charged is a lesser included crime." Because attempt is a lesser included crime, the State reasons Knight's conviction for attempted possession of cocaine "should therefore be a felony under K.S.A. [2008 Supp. 65-4160, possession of cocaine]." The State's reliance upon K.S.A. 21-3107 is misplaced. K.S.A. 21-3107(2) only applies during the prosecution of a crime and allows a defendant to "be convicted of either the crime charged or a lesser included crime." One definition for a lesser included crime in K.S.A. 21-3107(2)(c) is "an attempt to commit the crime charged." Hypothetically, under K.S.A. 21-3107(2), a defendant who is charged with possession of cocaine

could be convicted of the lesser included crime of attempted possession of cocaine instead. The sole purpose of K.S.A. 21-3107(2)(a) is to give the trier of fact the option to convict a defendant of the attempt crime if it finds that the elements of the charged crime have not been met. The State uses K.S.A. 21-3107(2) to characterize attempted possession of cocaine as the same crime as possession of cocaine, which is clearly not the purpose it was intended for and is an unreasonable interpretation of the statute.

Indeed, the State is urging the court to find a conviction *under* the principal crime even though Knight has been convicted only of an attempt of the principal crime. The State's suggestion is improper, however, because Knight was not convicted of possession of cocaine; he was convicted of attempted possession of cocaine. Only if Knight had actually committed the crime of possession of cocaine, and thus fulfilled all the elements of the crime, should he be considered as having a conviction under K.S.A. 2008 Supp. 65-4160(a). Any effort to place Knight's attempted possession of cocaine under K.S.A. 2008 Supp. 65-4160(a) would subvert the plain meaning of the statute.

Knight next contends that attempted possession of cocaine is a separate crime from possession of cocaine and relies on *State v. Martens*, 274 Kan. 459, 54 P.3d 960 (2002), to support his argument. In *Martens*, our Supreme Court determined that attempted manufacture of methamphetamine and manufacture of methamphetamine are separate offenses. 274 Kan. at 465. Attempted manufacture is controlled by the attempt statute, K.S.A. 21-3301, rather than the manufacture of controlled substances statute, K.S.A. 65-4159. 274 Kan. at 465. Knight contends that, under this reasoning, attempted possession of cocaine should likewise be a separate offense from possession of cocaine.

Nevertheless, the State does not dispute Knight's assertion that K.S.A. 21-3301 and K.S.A. 2008 Supp. 65-4160(a) are separate offenses. The State does disagree with Knight's use of *Martens* though and distinguishes it. The State points out that, unlike Knight, the defendant in *Martens* was only charged under K.S.A. 65-4159 for attempted manufacture of methamphetamine. The

State maintains that *Martens* did not make any determinations regarding K.S.A. 21-3301.

Knight improperly relies on *Martens* to establish that the crime of possession of cocaine is a separate offense from attempted possession of cocaine. Under the statutory language of K.S.A. 2008 Supp. 65-4160, the crime of possession of cocaine occurs only when all elements of the crime are established. Thus, to be convicted of possession of cocaine, the offender must actually be in possession of cocaine. In *Martens*, however, the title of the statute in question implied that attempts of manufacturing methamphetamine were also covered by the statute. 274 Kan. at 464-65. The *Martens* court turned to the statutory language and determined that attempt crimes were not included in the statute. In addition, the court found that "attempted manufacture of a controlled substance is a separate offense controlled by K.S.A. 21-3301(a)." 274 Kan. at 465. The *Martens* ruling does not apply to this case though because the statutory language of K.S.A. 2008 Supp. 65-4160, possession of cocaine, does not state or imply that an attempt to possess is covered by the statute. Instead, the general attempt statute, K.S.A. 22-3301, controls. As a result, even though *Martens* does not apply, attempted possession of cocaine is nonetheless a separate offense from possession of cocaine.

Knight also argues that when writing K.S.A. 21-4204(a)(4)(A), the legislature could have included attempt crimes. He points out another statute, K.S.A. 21-4643(a)(1), that mandates minimum terms of imprisonment for a variety of sex offenses. Along with the sex offenses enumerated in the statute is a clause that includes any attempt of the listed offenses. K.S.A. 21-4643(a)(1)(G). By omitting attempt crimes from K.S.A. 21-4204(a)(4)(A), Knight reasons that the legislature did not intend to include them in the firearms prohibition.

Indeed, a variety of examples similar to the one identified by Knight can be found in other Kansas criminal statutes. K.S.A. 21-4642 (habitual sex offender enhanced sentencing statute defines sexually violent crimes and includes attempts of those crimes); K.S.A. 21-3439(a)(4) (defines capital murder as the killing of the victim of several crimes and includes attempts of those crimes);

K.S.A. 21-4708 (crime severity level for drug offenses also applies to attempts of drug crimes). Each of these examples uses explicit language to include attempt crimes within a list of other enumerated crimes of the statute. Similar explicit language is absent in K.S.A. 21-4204(a)(4)(A).

This absence of explicit language from K.S.A. 21-4204(a)(4)(A) combined with the rule of lenity leads this court to determine that the legislature did not intend to include the separate crime of attempted possession of cocaine within K.S.A. 21-4204(a)(4)(A). Under the rule of lenity, when there is ambiguity in a penal statute's meaning, it should be narrowly construed in favor of the defendant. The rule of lenity encompasses laws establishing criminal liability. This is because citizens should have fair notice in the statute of conduct that is criminal. *State v. Zeit*, 39 Kan. App. 2d 364, 368, 180 P.3d 1068 (2008). When there is some reasonable doubt about the meaning of a criminal statute, a narrow interpretation ensures that the courts do not criminalize conduct that the legislature did not intend to make criminal, while leaving the legislature free to amend the statute to clarify its position and to provide notice to future actors that certain conduct is illegal. *State v. Coman*, 42 Kan. App. 2d 592, 610-11, 214 P.3d 1198 (2009) (Leben, J., dissenting) (citing Jellum, Mastering Statutory Interpretation 238 [2008]). Because the separate crime of attempted possession of cocaine is not explicitly included within K.S.A. 21-4204(a)(4)(A), we determine that such crime cannot be used to convict a defendant of criminal possession of a firearm under K.S.A. 21-4204(a)(4)(A). Accordingly, we reverse Knight's conviction for criminal possession of a firearm under K.S.A. 21-4204(a)(4)(A).

## Does Knight's Conviction for Carrying a Concealed Weapon Violate His Constitutional Right to Bear Arms?

Knight next contends that K.S.A. 21-4201(a)(4), which criminalizes the possession of a concealed firearm, violates his right to bear arms under the Second Amendment to the United States Constitution and under § 4 of the Kansas Constitution Bill of Rights. Although Knight admits that this issue was not brought up

at the trial court level, he argues that this court should hear it for the first time on appeal.

Issues not raised before the trial court cannot be raised on appeal. *State v. Warledo*, 286 Kan. 927, 938, 190 P.3d 937 (2008). Furthermore, constitutional grounds for reversal asserted for the first time on appeal are also not properly before the appellate court for review. *State v. Gant*, 288 Kan. 76, 82, 201 P.3d 673 (2009). Nevertheless, there are several exceptions to the general rule that a new legal theory may not be asserted for the first time on appeal, including the following: (1) the newly asserted theory involves only a question of law arising on proved or admitted facts and is finally determinative of the case; (2) the consideration of the theory is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of the trial court may be upheld on appeal despite its relying on the wrong ground or its assigning a wrong reason for its decision. *State v. Hawkins*, 285 Kan. 842, 845, 176 P.3d 174 (2008).

The constitutionality of a statute presents a question of law, which we review de novo. *Tolen v. State*, 285 Kan. 672, 673, 176 P.3d 170 (2008). The Second Amendment to the United States Constitution states: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

In response to Knight's claim, the State argues that the Second Amendment applies only to the federal government and not to the states. As a result, the State contends that Knight's argument has no merit. The State also points out that the recent United States Supreme Court case, *District of Columbia v. Heller*, 554 U.S. 570, 171 L. Ed. 2d 637, 128 S. Ct. 2783 (2008), did not address "whether the Second Amendment applies to the states." Nevertheless, the Supreme Court did not need to address Second Amendment application to the states, because *Heller* involved a gun regulation in the District of Columbia, not a state regulation. 554 U.S. at 621 (noting that the applicability of the Second Amendment to the states was not at issue in *Heller*).

Finally, the State cites *Maloney v. Cuomo*, 554 F.3d 56, 58 (2d Cir. 2009), for the proposition that the Second Amendment is only

a limitation on the federal government. The *Maloney* decision relied upon a prior Supreme Court case, *Presser v. Illinois*, 116 U.S. 252, 265, 29 L. Ed. 615, 6 S. Ct. 580 (1886), which held that the Second Amendment does not limit the power of the states. *Maloney*, 554 F. 3d at 58.

Knight counters that the Second Amendment applies to the states under the United States Supreme Court's modern 14th Amendment incorporation doctrine. Under the incorporation doctrine, certain substantive rights granted in the first eight amendments to the Constitution can be incorporated by the Due Process Clause of the 14th Amendment, and thus apply to the states. *Twining v. New Jersey*, 211 U.S. 78, 99, 53 L. Ed. 97, 29 S. Ct. 14 (1908), *overruled on other grounds Malloy v. Hogan*, 378 U.S. 1, 6, 12 L. Ed. 2d 653, 84 S. Ct. 1489 (1964). Knight maintains that the *Presser* decision cited by *Maloney* occurred before the Supreme Court's adoption of the incorporation doctrine. Consequently, Knight argues that *Presser* is not binding on the issue. Knight further maintains that the *Maloney* court failed to "conduct a selective incorporation analysis of whether the right to bear arms should apply to the states."

Under a selective incorporation analysis, only certain fundamental rights and liberty interests are protected. *Washington v. Glucksberg*, 521 U.S. 702, 720, 138 L. Ed. 2d 772, 117 S. Ct. 2258 (1997). These protected rights and interests are those "which are, objectively, 'deeply rooted in this Nation's history and tradition,' [citations omitted] and 'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed' [citation omitted]." 521 U.S. at 720-21. Examples of fundamental protected rights and interests recognized by the United States Supreme Court include "the rights to marry [citation omitted]; to have children [citation omitted]; to direct the education and upbringing of one's children [citations omitted]; to marital privacy [citation omitted]; to use contraception [citations omitted]; to bodily integrity [citation omitted], and to abortion [citation omitted]." 521 U.S. at 720. Nevertheless, the Supreme Court has never determined whether the right to bear arms is a fundamental protected right or interest.

In *Heller*, Knight contends that when the Supreme Court implied the right to bear arms, it acknowledged a fundamental right. Knight further points out that the Ninth Circuit Court of Appeals, in *Nordyke v. King*, 563 F.3d 439, 457 (9th Cir. 2009), *vacated* 611 F.3d 1015 (9th Cir. 2010) (en banc), concluded that the right to bear arms is incorporated by the 14th Amendment based on the *Heller* opinion under a selective incorporation approach.

In contrast, several courts have expressed disagreement with the *Nordyke* decision. See *National Rifle Ass'n of Amer. v. City of Chicago*, 567 F.3d 856 (7th Cir. 2009), *rev'd* 561 U.S. 742, 177 L. Ed 2d 894, 130 S. Ct. 3020 (2010); *State v. Turnbull*, 766 N.W.2d 78, 80 (Minn. App. 2009); *Crespo v. Crespo*, 408 N.J. Super. 25, 41-43, 972 A.2d 1169 (2009). In rejecting *Nordyke's* selective incorporation approach, the *NRA* court determined that the Second Amendment, under current Supreme Court precedents, is not one of the parts of the Bill of Rights that has been incorporated by the 14th Amendment. As a result, the *NRA* court concluded that the Second Amendment does not apply to the states. In addition, the *NRA* court agreed with the Second Circuit Court of Appeals' decision in *Maloney*. There, the *Maloney* court held that *United States v. Cruikshank*, 92 U.S. 542, 23 L. Ed. 588 (1876); *Presser*; and *Miller v. Texas*, 153 U.S. 535, 14 S. Ct. 874, 38 L. Ed. 812 (1894), still control. In those cases, the Supreme Court had specifically rejected attempts to apply the Second Amendment to the states.

Nevertheless, the United States Supreme Court recently held that the right to "keep and bear arms" embodied in the Second Amendment applies not only to the federal government, but also to the individual states. See *McDonald v. Chicago*, 561 U.S. 742, 177 L. Ed. 2d 894, 130 S. Ct. 3020 (2010). A four-justice plurality agreed that the Due Process Clause of the 14th Amendment to the United States Constitution "incorporates" the Second Amendment's right to keep and bear arms, which was recognized in *District of Columbia v. Heller*, 554 U.S. 570, 171 L. Ed. 2d 637, 128 S. Ct. 2783 (2008).

In addition, in arguing that the concealed firearms ban is unconstitutional, Knight returns to *Heller*. He contends that the *Hel-*

*ler* opinion extends individuals a right to bear arms outside the home. Knight points out that *Heller* specifically contemplated individuals carrying a firearm on themselves or in their clothing. 554 U.S. at 584. He further argues that *Heller* conferred an individual right, not only to carry, but also to carry concealed firearms on oneself outside of the home. The State, on the other hand, urges that *Heller* be read narrowly, only applying to "absolute prohibitions of handguns held and used for self-defense in the home."

In *Heller*, a police officer challenged a Washington, D.C., ban on handguns. Under the ban, despite a registration requirement, handguns could not be registered and a special license was necessary to carry a handgun. Even lawfully owned firearms were required to be " 'unloaded and dissembled or bound by a trigger lock or similar device.' " 554 U.S. at 575. The Supreme Court's decision turned solely on the issue of handgun possession in the home. The Court explicitly stated that the "ban on handgun possession in the home" and the "prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense" were violations of the Second Amendment. 554 U.S. at 635. It is clear that the Court was drawing a narrow line regarding the violations related solely to use of a handgun in the home for self-defense purposes. Knight's argument, that *Heller* conferred on an individual the right to carry a concealed firearm, is unpersuasive.

Knight admits that *Heller* examined 19th-century case law and found that a majority of courts ruled that prohibitions on concealed firearms were constitutional. Nevertheless, Knight maintains that when the *Heller* Court listed various regulations that were presumptively lawful, it failed to mention prohibitions on concealed firearms. Knight contends that this omission by the Supreme Court meant that prohibitions on concealed firearms are not presumptively lawful.

The State counters by asserting that the *Heller* Court's list of presumptively lawful regulatory measures was not exhaustive. In its decision, the *Heller* Court specifically stated that its list was not exhaustive and only served to identify examples of presumptively constitutional laws under the Second Amendment. 554 U.S. at 627. Any failure by the *Heller* Court to include prohibitions on concealed firearms does not imply that such requirements are uncon-

stitutional. Additionally, the *Heller* Court specifically mentioned prohibitions on concealed firearms in the sentence before its list of presumptively lawful prohibitions. 554 U.S. at 626-27. The *Heller* Court began the paragraph stating that "the right secured by the Second Amendment is not unlimited" and, two sentences later, noted prohibitions on carrying concealed firearms as an example. 554 U.S. at 626. This clearly shows that the *Heller* Court considered concealed firearms prohibitions to be presumptively constitutional under the Second Amendment. As a result, Knight's argument fails.

## DID THE TRIAL COURT ERR IN ORDERING KNIGHT TO REIMBURSE THE BOARD OF INDIGENTS' DEFENSE SERVICES FOR ATTORNEY FEES?

Finally, Knight contends that the trial court incorrectly ordered him to reimburse the Board of Indigents' Defense Services (BIDS) for attorney fees without first inquiring about his ability to pay or determining whether a financial burden would be placed on him if required to pay.

K.S.A. 22-4513 provides for the reimbursement of BIDS attorney fees by convicted criminal defendants. K.S.A. 22-4513(b) reads in part: "In determining the amount and method of payment of such sum, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose."

Interpretation of a statute is a question of law over which this court has unlimited review. *State v. Jefferson*, 287 Kan. 28, 33, 194 P.3d 557 (2008).

In *State v. Robinson*, 281 Kan. 538, 546, 132 P.3d 934 (2006), our Supreme Court directed sentencing courts, at the time of the initial assessment of BIDS attorney fees under K.S.A. 22-4513, to "consider the financial resources of the defendant and the nature of the burden that payment will impose *explicitly*, stating on the record how those factors have been weighed in the court's decision." The remedy for a sentencing court's failure to make such

explicit findings is to remand to the sentencing court for such findings. 281 Kan. at 548.

Here, Knight made no objection to the trial court's failure to inquire about his financial resources or the burden a reimbursement payment would place on him. Nevertheless, a failure to object to the imposition of BIDS fees has not disallowed parties from raising the issue for the first time on appeal. See *Robinson*, 281 Kan. at 541; *State v. Hawkins*, 37 Kan. App. 2d 195, 197, 152 P.3d 85 (2007), *aff'd* 285 Kan. 842, 176 P.3d 174 (2008).

The State argues that the court did consider Knight's financial resources when it asked Knight how much he could pay toward the fees and when he could start paying the fees. Nevertheless, the facts in this case show that the sentencing court failed to make the necessary *Robinson* inquiries. The trial court merely asked Knight how much he could pay and when he could start paying it back; it did not inquire into Knight's financial resources. The trial court also did not consider the nature of the burden a reimbursement payment would impose on Knight. Finally, the court did not state how those factors were weighed in coming to the decision to impose a reimbursement payment on Knight.

Consequently, the trial court erred in ordering Knight to pay BIDS fees without first making the proper *Robinson* inquiries on the record.

Affirmed in part, reversed in part, vacated in part, and remanded with directions.