Nos. 127,994
127,995

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

TAVIAN TISHUN GARRETT,
*Appellant.*

SYLLABUS BY THE COURT

1.

Judges should define words in jury instructions when the Legislature has defined those words inconsistently with the ordinary, contemporary, and common meanings of the terms, such as in the Kansas Offender Registration Act.

2.

The scope of section 15 of the Kansas Constitution's Bill of Rights governing searches and seizures is identical to that of the Fourth Amendment to the United States Constitution.

3.

The Fourth Amendment is not implicated unless the person invoking its protection had a justifiable, reasonable, or legitimate expectation of privacy that was invaded by government action.

1

4.

Law enforcement's warrantless use of a pole camera to observe a home for 13 days to record only what the public could observe does not amount to a search under the Fourth Amendment.

Appeal from Riley District Court; KENDRA LEWISON, judge. Submitted without oral argument. Opinion filed May 22, 2026. Affirmed in part, vacated in part, and remanded with directions.

*Grace E. Tran*, of Kansas Appellate Defender Office, for appellant.

*David Lowden*, deputy county attorney, *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before GARDNER, P.J., ARNOLD-BURGER and SCHROEDER, JJ.

GARDNER, J.: Tavian Tishun Garrett pleaded guilty to aggravated indecent solicitation of a child and was sentenced to probation in the Riley County District Court. He was later convicted of failing to comply with the offender registration requirements imposed due to his solicitation conviction. Because of his registration violation conviction, the district court found that he had violated his probation and extended it. Garrett now appeals his conviction for the offender registration violation and the extension of his probation.

Garrett challenges the jury instructions, the denial of his motion to suppress, the sufficiency of the evidence supporting the offender registration violation, and the imposition of Board of Indigents' Defense Services (BIDS) attorney fees. After careful review, we affirm Garrett's conviction and the extension of his probation but vacate the order of BIDS attorney fees and remand for further proceedings.

FACTUAL AND PROCEDURAL BACKGROUND

This case involves the interplay of two cases: the extension of Garrett's probation in 20CR620, and his direct appeal from his conviction and sentence for an offender registration violation in 23CR243. In case 20CR620, Garrett pleaded guilty to aggravated indecent solicitation of a child and received 36 months' probation with an underlying 32-month prison sentence. The district court ordered lifetime offender registration because of this conviction. See K.S.A. 22-4902(c)(7); K.S.A. 22-4906(d)(2). While on probation for his solicitation case, Garrett was charged in 23CR243 with violating the Kansas Offender Registration Act (KORA), K.S.A. 22-4901 et seq. Based on the commission of this new crime, the State moved to revoke Garrett's probation in his solicitation case.

*Case 20CR620—the Probation Violation*

At the probation violation hearing, the State argued that Garrett was residing at an address that he had not registered—his girlfriend's home. M.T. was his girlfriend and mother of his child. In support of its argument, the State presented 10 photographs from a motion-activated camera installed on a city light pole across from M.T.'s home. The 10 photos were a sample from at least 30 photos showing Garrett coming and going from the home during the 2-week period from May 6, 2023, to May 18, 2023. Garrett's counsel asserted that the district court should not find a violation of probation because the surveillance from the pole camera violated his Fourth Amendment right to be free from unreasonable searches.

The district court found Garrett in violation of his probation for committing the alleged KORA violation—failing to timely register his change of residence. Garrett's counsel then filed identical motions to suppress. The district court held a hearing on the motions and then denied the motions in both cases, determining that Garrett had not presented any compelling basis to reconsider the decision that he had violated his

probation. But the disposition of the violation was delayed until after the trial for the KORA violation, per Garrett's request.

*Case 23CR243—a KORA Violation*

At the trial in 23CR243, the State presented evidence that Garrett first registered his residence as being M.T.'s house in Riley County on August 25, 2022. He registered this same address on November 4, 2022. But on November 29, 2022, M.T. received a notice of noncompliance from her property manager for having an unauthorized tenant in the residence. According to M.T., her landlord said that Garrett's listing her address on the offender registry created the issue but Garrett's being at the residence was not an issue. So, at M.T.'s request, Garrett stopped listing her address on the registry. Instead, he registered a different address in December 2022 and March 2023.

In May 2023, the Riley County Police Department began investigating a tip that Garrett was still living at M.T.'s house. On May 5, 2023, an officer drove to the residence and saw Garrett's car parked there. The officer spoke to M.T., but she denied that Garrett lived there. That same day, law enforcement installed a camera on a city street pole across the street from M.T.'s house, without a warrant. They removed it on May 19, 2023.

In addition to officer testimony, the State admitted photos of Garrett leaving the house and returning to it daily at various times from May 6 to May 19, a spreadsheet that noted the times and dates of the admitted photos, and a timecard report that showed the times and dates that Garrett had worked in that timeframe. On many of those days, the evidence, viewed together, appeared to show Garrett leaving for work early in the morning and returning to the house in the afternoon. The photos showed that Garrett had stayed overnight for 13 consecutive nights, except for the night of May 19 when the camera was removed.

On May 19, a detective with the Riley County Police Department went to the house and spoke with Garrett. Garrett said that his girlfriend and daughter lived there and admitted that he slept there because that was where they were staying. He told the detective he was not registering the address because M.T. would risk getting evicted if he did.

M.T. testified that Garrett had been at her house for 3 consecutive days at some point between January 2023 and the middle of April 2023, and that he was also there for at least 10 days in a month during that time. She testified that in February 2023 Garrett had stayed at the house to help care for her and their daughter after M.T. had surgery.

The jury found Garrett guilty of violating KORA by failing to register his change of address or commencement of a new address.

*Sentencing in Both Cases*

The district court held a joint hearing for both sentences. For the KORA violation, the district court sentenced Garrett to 24 months' probation with an underlying 19-month prison sentence and a 60-day jail sanction. The district court also ordered Garrett to pay a $2,000 BIDS attorney fee. In Garrett's solicitation case, the district court extended Garrett's probation by 24 months and ordered him to serve another 60-day jail sanction, consecutive to the first.

Garrett timely appeals both cases, which we consolidated on appeal.

ANALYSIS

Garrett raises four arguments. First, Garrett argues the district court violated his constitutional right to have the jury determine guilt beyond a reasonable doubt on every

element of the KORA violation in its jury instruction on "reside." Second, Garrett argues that the district court erred by denying his motions to suppress photos taken by a camera mounted on a pole outside the residence. Third, Garrett argues that insufficient evidence supports his KORA violation conviction because the State presented no evidence that he changed his residence during the charged time period of May 5 through May 19, 2023. Fourth, he argues that the district court failed to comply with K.S.A. 22-4513(b) before imposing a BIDS attorney fee. He asks us to reverse his conviction for a KORA violation, reverse the extension of his probation, and vacate the BIDS attorney fee.

I.    *Did the jury instructions violate Garrett's constitutional right to have a jury determine guilt beyond a reasonable doubt on every element of the charged offense?*

First, Garrett argues that the jury instruction defining "reside" violated his constitutional right to have the jury determine his guilt beyond a reasonable doubt on every element of a KORA violation. He claims that the instruction's definition of "reside" amounted to a directed verdict.

*Review of Jury Instructions*

"The Sixth Amendment to the United States Constitution and Sections 5 and 10 of the Kansas Constitution Bill of Rights guarantee a criminal defendant the right to a jury trial." *State v. Redick*, 307 Kan. 797, 803, 414 P.3d 1207 (2018). This guarantee includes a right to "'a jury determination that [the defendant] is guilty of every element of the crime with which [the defendant] is charged, beyond a reasonable doubt.'" *State v. Johnson*, 310 Kan. 909, 918, 453 P.3d 281 (2019) (quoting *Apprendi v. New Jersey*, 530 U.S. 466, 476-77, 120 S. Ct. 2348, 147 L. Ed. 2d 435 [2000]). Garrett argues that the jury instructions violated these rights.

6

To determine whether he is correct, we use a three-step inquiry:

> "Appellate courts apply a three-step inquiry to jury instruction issues, asking: (1) whether the appellate court has jurisdiction or whether the issue has been preserved for review; (2) whether an instructional error occurred, that is whether the disputed instruction was legally and factually appropriate when the entire record is reviewed in the light most favorable to the requesting party; and (3) whether, if error occurred, it is reversible, meaning is there a reasonable probability that any error affected the outcome of the trial in light of the entire record?" *State v. Alvarado-Meraz*, 321 Kan. 51, 70, 573 P.3d 266 (2025).

*Preservation*

The State charged Garrett with an offender registration violation because he failed to register a change or termination of residence location within three business days between May 5 and May 19, 2023. The parties argued at length, both pretrial and during instruction conference, about how the instructions should define "residence" and "reside."

At a pretrial motions conference, the district court and the parties discussed K.S.A. 22-4902(k), which defines "residence," and whether to instruct the jury on the definition of "reside" in K.S.A. 22-4902(j), which refers to a presumption.

> "'[R]eside' means to stay, sleep or maintain with regularity or temporarily one's person and property in a particular place other than a location where the offender is incarcerated. It shall be presumed that an offender resides at any and all locations where the offender stays, sleeps or maintains the offender's person for three or more consecutive days or parts of days, or for ten or more nonconsecutive days in a period of 30 consecutive days."

The State argued that this language merely defined "reside" and did not create an impermissible presumption. Garrett's counsel countered that the statutory presumption is unconstitutional and that any instruction containing such language would be legally

7

inappropriate. Garrett's counsel added that even if the district court were to state it was a permissive inference rather than a mandatory rebuttable presumption, the instruction would still be legally erroneous because it would be inconsistent with the language of K.S.A. 22-4902(j). Garrett's counsel concluded that the jury should not be instructed on the length of time that could constitute "reside."

The district court, at a later pretrial hearing, found the presumption language was problematic and would not be used. The district court was, however, persuaded by *State v. Marquez*, No. 121,513, 2020 WL 5740857, at *4 (Kan. App. 2020) (unpublished opinion), that it was legally appropriate for the definition of "reside" to include the number of days that the defendant spent at one location. Garrett's counsel objected and argued that *Marquez* predated other cases that held that a jury could not be instructed on unconstitutional presumptions or permissive inferences not included in the relevant statutes.

At the jury instructions conference, both parties repeated their positions. The district court, over Garrett's counsel's objection, determined that it would give an instruction that defined "residence" as K.S.A. 22-4902(k) does: "[A] particular and definable place where an individual resides. Nothing in the Kansas offender registration act shall be construed to state that an offender may only have one residence for the purpose of such act."

And it would give another jury instruction that defined "reside" similarly to the definition of that term in K.S.A. 22-4902(j):

> "'Reside' means to stay, sleep or maintain with regularity or temporarily one's
> person and property in a particular place other than a location where the offender is
> incarcerated. Under Kansas law, 'reside' includes any and all locations where the offender

stays, sleeps or maintains the offender's person for three or more consecutive days or parts of days, or for ten or more nonconsecutive days in a period of 30 consecutive days."

The jury was so instructed. Garrett has preserved this issue for our review.

*Factual and Legal Appropriateness of the Instruction*

It is the jury's role to determine the facts independently of the district court and to apply the law to the facts. *State v. Ingham*, 308 Kan. 1466, 1474, 430 P.3d 931 (2018). "An instruction that includes a factual determination by the trial court violates a defendant's right to have a jury determine his or her guilt or innocence by invading the province of the jury as the fact-finder. [Citations omitted.]" 308 Kan. at 1474. See also *State v. Williams*, 308 Kan. 1439, 1451-52, 430 P.3d 448 (2018). But, here, the challenged jury instruction did not include a factual determination. Instead, it stated the statutory definition of an element the State had to prove.

The State was required to prove that Garrett failed to "register in person upon any commencement, change or termination of residence location . . . within three business days of such commencement, change or termination, to the registering law enforcement agency or agencies where last registered." K.S.A. 22-4905(h). The relevant statute defines "reside" as

"to stay, sleep or maintain with regularity or temporarily one's person and property in a particular place other than a location where the offender is incarcerated. It shall be presumed that an offender resides at any and all locations where the offender stays, sleeps or maintains the offender's person for three or more consecutive days or parts of days, or for ten or more nonconsecutive days in a period of 30 consecutive days." K.S.A. 22-4902(j).

9

The jury instruction, set out above, repeated this language word-for-word with one exception: rather than stating, "It shall be presumed" that an offender resides at certain locations, the instruction substituted, "Under Kansas law, 'reside' includes" those same locations.

We find guidance from a recent KORA case in which the district court did *not* instruct the jury on "residence" and "reside." In *State v. Ballard*, 320 Kan. 269, 279-83, 566 P.3d 1092 (2025), the Kansas Supreme Court found it reversible error not to instruct the jury on the definitions of "residence," "reside," and "transient." The *Ballard* court concluded "that KORA's definitions differ from common definitions of the words and that the witnesses reinforced those common meanings rather than accurately explaining KORA's definitions." 320 Kan. at 279. See also *State v. Bradford*, No. 128,110, 2026 WL 252912, at *3-4 (Kan. App. 2026) (applying *Ballard* and finding clear error when the district court did not instruct the jury on the terms "residence" and "reside"). *Ballard* teaches that judges should define words in jury instructions when the Legislature has defined those words inconsistently with the ordinary, contemporary, and common meanings of those words, such as in KORA.

Although the instructions largely incorporated the statutory definitions, they failed to incorporate the presumption in K.S.A. 22-4902(j) that a registrant resides at a place they stay or sleep for three or more consecutive days. But Garrett's counsel vigorously and repeatedly argued against including the permissive presumption language in K.S.A. 22-4902(j) in the jury instructions. He affirmatively argued to the district court that such an instruction should *not* be given. Thus, to the extent the district court's failure to include the presumption and instruct the jury on how to apply it is error, it is invited error which precludes Garrett from challenging the instruction. See *State v. Smith*, 317 Kan. 130, 139, 526 P.3d 1047 (2023).

Garrett's argument on appeal is the converse—that the instruction amounted to a directed verdict because it told the jury that an element of the offense had been met. But it resulted from not instructing the jury on the presumption that Garrett argued against. This argument, even if properly before this court, also fails.

In cases finding an unconstitutional mandatory presumption, the district court explicitly instructed the jury that an essential element of the crime charged had been satisfied by the State's trial evidence. See, e.g., *State v. Brice*, 276 Kan. 758, 761-62, 80 P.3d 1113 (2003) (finding an instruction invaded the province of the jury by stating "'the term Great Bodily Harm means a "through and through bullet wound"'" because it told the jury that the State had established an essential element of aggravated battery); *State v. Colbert*, 244 Kan. 422, 425, 427, 769 P.2d 1168 (1989) (finding impermissible a jury instruction that "a firearm is a deadly weapon as a matter of law"); see also *Francis v. Franklin*, 471 U.S. 307, 315-18, 105 S. Ct. 1965, 85 L. Ed. 2d 344 (1985) (finding unconstitutional an instruction stating that "'[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will,'" which essentially told the jury that the State had established the intent element of murder).

In contrast, the instructions here did not tell the jury that the State had proved an essential element of the crime charged—the instructions merely told the jury what the State had to prove. See *Williams*, 308 Kan. at 1450-55 (defendant charged with "aggravated assault with 'a deadly weapon, to wit: baseball bat'" and the jury was instructed the State had to prove "'the defendant used a deadly weapon, a baseball bat'" was not improper because the instruction merely told the jury what the State had to prove); *State v. Sisson*, 302 Kan. 123, 130-31, 351 P.3d 1235 (2015) (no error when one instruction defined drug paraphernalia and another instruction stated that drug paraphernalia included scales); *State v. Sutherland*, 248 Kan. 96, 99-101, 804 P.2d 970 (1991) (no error in instructing the jury that the State had to prove "'Sutherland was armed

11

with a deadly weapon, to-wit: a knife,'" as the instruction did not direct the jury to find the knife was a deadly weapon but only explained the State's burden of proof).

That Garrett's conduct aligns precisely with the Legislature's definition of "residence" and "reside" fails to show that the instruction amounted to a directed verdict or removed an element from the jury's consideration.

II.    *Did the district court err by denying Garrett's motions to suppress?*

Garrett next argues that the district court erred by denying his motions to suppress photos taken by the pole camera outside the residence. He contends that surveillance from the pole camera across from M.T.'s house was an unreasonable search in violation of the Fourth Amendment to the United States Constitution and section 15 of the Kansas Constitution Bill of Rights because it violated his reasonable expectation of privacy.

*Standard of Review*

On a review of a district court's decision regarding a motion to suppress, an appellate court generally reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo. *State v. Garrett*, 319 Kan. 465, 469, 555 P.3d 1116 (2024). Substantial competent evidence is evidence possessing both relevance and substance while furnishing a substantial factual basis from which issues can reasonably be resolved. *State v. Sanders*, 310 Kan. 279, 294, 445 P.3d 1144 (2019). The State has the burden of proving that a search and seizure was lawful. *State v. Anderson*, 281 Kan. 896, 901, 136 P.3d 406 (2006).

An appellate court will not reweigh evidence, assess witness credibility, or resolve conflicting evidence, and will disregard "any conflicting evidence or other inferences that

might be drawn from the evidence." *State v. G.O.*, 318 Kan. 386, 407, 543 P.3d 1096 (2024).

*Additional Facts*

Before we analyze the merits of Garrett's argument, we consider additional facts. In both cases, Garrett's counsel filed identical motions to suppress photos taken by the pole camera, arguing that the surveillance was an unreasonable search in violation of the Fourth Amendment and section 15 of the Kansas Constitution. The district court held a combined suppression hearing on both motions. At that hearing, in lieu of admitting new evidence, the parties agreed the district court could take judicial notice of prior testimony and evidence from Garrett's probation revocation hearing in 20CR620, his preliminary hearing in 23CR243, and Garrett's Exhibit A, which included approximately 4,200 photos taken by the pole camera.

This evidence established that the pole camera was installed on May 5, 2023, was taken down on May 19, 2023, and had repeatedly photographed Garrett, M.T., and their daughter going in and out of the house. The camera could view and take photos of the front porch and front door, which was on the side of the house, but it could not see into the front door. The camera took photos when it sensed motion in a designated area, took photos at set intervals, and took photos at night. The camera took approximately 4,200 photos of the front of the house, but the State introduced only 10 of them into evidence.

After considering the evidence and arguments from counsel, the district court denied both motions to suppress, ruling identically in both cases. It found no Fourth Amendment violation for eight reasons: (1) the camera was mounted on a public utility pole and was not within the curtilage of the home; (2) all areas viewable by camera were also viewable from the public street at eye level, even though the camera was raised above eye level; (3) the camera sometimes revealed a sliver of light when the door

opened but revealed nothing inside the home when the light was not on; (4) the photos were of the outside of the residence only; (5) an individual cannot have a reasonable expectation of privacy in what is knowingly exposed to the public; (6) this case was distinguishable from cases cited by Garrett's counsel; (7) pole-mounted cameras are unlike GPS trackers installed on cars that track all movements of a person, including into private spaces; and (8) the length of the surveillance was comparable to times in other cases that approved of pole-mounted cameras.

The district court distinguished this case from several finding Fourth Amendment violations: *Kyllo v. United States*, 533 U.S. 27, 32, 121 S. Ct. 2038, 150 L. Ed. 2d 94 (2001) (when the government monitored the inside of the house based on heat coming from it); *Katz v. United States*, 389 U.S. 347, 357, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (when the government listened to a private conversation in a phone booth); and *People v. Tafoya*, 494 P.3d 613 (Colo. 2021) (when a pole camera recorded continuously for three months events that would otherwise be protected by a privacy fence).

With these facts in mind, we move to the merits of Garrett's argument.

*General Fourth Amendment Principles*

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV ("The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."). Section 15 enshrines the same protection. Kan. Const. Bill of Rights, § 15 ("The right of the people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate . . . ."). Our Supreme Court has recently noted that the scope of section 15 of the Kansas Constitution Bill of Rights is identical to that of the Fourth Amendment to the United States Constitution, so we focus

14

our discussion on the Fourth Amendment, where the caselaw is more plentiful. *State v. Volle*, 321 Kan. 447, 456, 580 P.3d 1223 (2025).

Warrantless searches are per se unreasonable unless they fall within an exception to the warrant requirement. *State v. Crudo*, 318 Kan. 32, 35, 541 P.3d 67 (2024). The judicially created exclusionary rule is designed "to deter unlawful searches and seizures by prohibiting the prosecution's use of unconstitutionally obtained evidence." *State v. Perkins*, 310 Kan. 764, 767, 449 P.3d 756 (2019). For the exclusionary rule to apply, there must first be a constitutional violation. *State v. Hubbard*, 309 Kan. 22, 33, 430 P.3d 956 (2018). The rule applies when it would deter law enforcement's conduct. *Utah v. Strieff*, 579 U.S. 232, 241, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016).

But not all collection of information by the government, including surveillance, qualifies as a "search" within the meaning of the Fourth Amendment. In this context, a Fourth Amendment search occurs only if the target had a "reasonable expectation of privacy" in the area searched. *Katz*, 389 U.S. at 360 (Harlan, J., concurring). As the Kansas Supreme Court recently found, "the Fourth Amendment is not implicated unless the person invoking its protection had a justifiable, reasonable, or legitimate expectation of privacy that was invaded by government action." *Volle*, 321 Kan. at 464.

"To establish a legitimate expectation of privacy, a defendant must demonstrate a subjective expectation of privacy in the area searched and that the expectation was objectively reasonable." *State v. Robinson*, 293 Kan. 1002, 1014, 270 P.3d 1183 (2012). Although the State must prove the validity of a search, the person seeking the suppression of the evidence must first demonstrate that the government action qualified as a "search" within the meaning of the Fourth Amendment. See 293 Kan. at 1014; *Anderson*, 281 Kan. at 901. "'The ultimate question is whether one's claim to privacy from the government intrusion is reasonable in light of all the surrounding circumstances.'" *Robinson*, 293 Kan. at 1014 (quoting *United States v. Angevine*, 281 F.3d 1130, 1134 [10th Cir. 2002]).

15

Thus, to benefit from the exclusionary rule, Garrett had to show that he had both a subjective expectation to privacy in the exterior of the residence and that his expectation of privacy was objectively reasonable. If he cannot do so, then the surveillance is not a "search" within the meaning of the Fourth Amendment, and the State would bear no burden to establish that its surveillance did not violate the Fourth Amendment.

*Garrett's Subjective Expectation of Privacy*

We first ask whether Garrett has "manifested a subjective expectation of privacy" in the exterior of the residence. See *California v. Ciraolo*, 476 U.S. 207, 211, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986); *Robinson*, 293 Kan. at 1014. A defendant's subjective expectation of privacy can be shown by the precautions taken to maintain that privacy. For example, a defendant manifests such a desire if he or she, at a minimum, takes "'normal precautions to maintain his privacy,'" such as installing a high fence to prevent "casual, accidental observation" from sidewalk traffic. *Ciraolo*, 476 U.S. at 211-12 (quoting *Rawlings v. Kentucky*, 448 U.S. 98, 105, 100 S. Ct. 2556, 65 L. Ed. 2d 633 [1980]). Thus, the homeowner in *Tafoya* demonstrated a subjective expectation of privacy because he had built a 6-foot-high privacy fence around the backyard, which was the area surveilled, and he used the fence's wooden gate to prevent the public from being able to see into his backyard. *Tafoya*, 494 P.3d at 622. The surveilled area was significantly set back from the street, so a person standing on the street could not see into the backyard. Police surveilled Tafoya's front yard, backyard, and driveway for more than three months, using a pole camera across the street from his property. But the detached garage, backyard, and part of the driveway were enclosed by a 6-foot-high privacy fence, and the camera allowed the police to view parts of Tafoya's property "not usually visible to members of the public." 494 P.3d at 615. Not so here.

In contrast to *Tafoya*, the district court held that Garrett did not have a subjective expectation of privacy in the exterior of his home because: (1) the camera was mounted

16

on a public utility pole and not within the curtilage of the home; (2) all areas viewable by camera were viewable from the public street at eye level, even though the camera was mounted above eye level; (3) the camera revealed a sliver of light possibly from a lamp when the door opened but nothing when the light source was not on; and (4) the photos showed only the outside of the residence.

These factual findings are supported by substantial competent evidence. The officer who placed the camera testified that he mounted it on a public light pole and not on private property. The pictures show no fence on the property or any attempt to conceal from public view what was shown in the pictures, even though the camera was mounted higher than eye level. And the pictures show no more of the inside of the house than what a passerby could have seen, including the momentary and minimal glimpse into the open front door. It had no fences or other concealments designed to obscure the view of anyone coming and going from the home, or of any activity in or surrounding the yard. Garrett made no attempt to screen the activity from views of casual observers, which undermines any subjective expectation of privacy.

Whether law enforcement's use of pole cameras violates the Fourth Amendment is an issue of first impression in Kansas. But "[w]hat a person knowingly exposes to the public through an open door or window does not receive Fourth Amendment protection." *United States v. Davis*, 326 F.3d 361, 365 (2d Cir. 2003). "The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what we have called 'open fields'— even if those fields are privately owned—because such fields are not enumerated in the Amendment's text." *Florida v. Jardines*, 569 U.S. 1, 6, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) (citing *Hester v. United States*, 265 U.S. 57, 44 S. Ct. 445, 68 L. Ed. 898 [1924]). We apply that rationale here—Garrett showed no expectation of privacy in the part of M.T.'s house that was open to public view.

17

Garrett separately argues that he need not show a subjective expectation of privacy under *Katz* because the photos showed the curtilage of M.T.'s house—the area immediately surrounding the residence in which "the intimate activity associated with the 'sanctity of a man's home and the privacies of life'" extend. *Oliver v. United States*, 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984); see *State v. Fisher*, 283 Kan. 272, 282, 154 P.3d 455 (2007). But reliance on the curtilage doctrine is misplaced here. The curtilage doctrine applies only when the government trespasses or works an "unlicensed physical intrusion" onto a defendant's property. *State v. Talkington*, 301 Kan. 453, 462, 472, 345 P.3d 258 (2015); see *Collins v. Virginia*, 584 U.S. 586, 593-94, 138 S. Ct. 1663, 201 L. Ed. 2d 9 (2018) (finding officers physically intruding on the curtilage of Collins' home to search a motorcycle invaded Collins' Fourth Amendment interest in both the motorcycle and the curtilage of his home); see also *Talkington*, 301 Kan. at 462 ("[B]ecause officers garnered their information by physically intruding onto Garrison's property, we need not decide whether the officer's unlawful investigation of his curtilage violated *Garrison*'s expectation of privacy under *Katz*."); *Jardines*, 569 U.S. at 7 (Since the officers' investigation took place in a constitutionally protected area—curtilage—"we turn to the question of whether it was accomplished through an unlicensed physical intrusion."). No such intrusion is alleged to have occurred here. We thus apply the second prong of the *Katz* test.

*The Objective Reasonableness of Garrett's Purported Expectation of Privacy*

We next determine whether Garrett's purported expectation was objectively reasonable. *Robinson*, 293 Kan. at 1014. To do so, we first consider the public exposure of the area and then review the duration, continuity, and nature of the surveillance.

"What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz*, 389 U.S. at 351. And the "Fourth Amendment protection of the home has never been extended to require law enforcement

18

officers to shield their eyes when passing by a home on public thoroughfares." *Ciraolo*, 476 U.S. at 213; see *Collins*, 584 U.S. at 600 (affirming the "ability to observe inside curtilage from a lawful vantage point"). To the contrary, "[g]enerally, the police are free to observe whatever may be seen from a place where they are entitled to be." *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997).

"So, for example, an individual enjoys no objectively reasonable expectation of privacy in outdoor premises open to the public, when a government inspector enters to examine smoke coming from the owner's chimney. See *Air Pollution Variance Bd. v. W. Alfalfa Corp.*, 416 U.S. 861, 862-65, 94 S. Ct. 2114, 40 L. Ed. 2d 607 (1974)[.] Neither is one's expectation of privacy objectively reasonable on a property outsiders could enter at will or observe from the public highway, see *Lace*, 669 F.2d at 49-51; in an area that the government can observe by plane, see *Dow Chem. Co. v. United States*, 476 U.S. 227, 235, 239, 106 S. Ct. 1819, 90 L. Ed. 2d 226 (1986); or for a property visible over a fence to individuals perched atop 'a [hypothetical] truck or a two-level bus,' see *Ciraolo*, 476 U.S. at 211." *United States v. Harry*, 130 F.4th 342, 349 (2d Cir. 2025).

The public exposure of Garrett's area points toward a finding that even if Garrett had a subjective expectation of privacy, his subjective expectation was not reasonable. The front of the property was plainly visible from any public vantage point from the front or side of the house. The pole camera was mounted in a lawful public location across the street and recorded only what could be viewed in plain sight with the naked eye by any member of the public from that vantage point without using any technology to reveal what was otherwise hidden. See *United States v. Green*, 149 F.4th 733, 746 (D.C. Cir. 2025) (pointing out these same factors, while contrasting *Kyllo*, 533 U.S. at 40, which found an illegal search because the government used thermal-imaging technology not generally available to the public to discern what was going on in the house and would not have been knowable without an intrusion into the house).

We next consider the duration, continuity, and nature of the surveillance. See *United States v. Jones*, 565 U.S. 400, 429-31, 132 S. Ct. 945, 181 L. Ed. 2d 911 (2012) (Alito, J., concurring). Garrett argues that the number of photos (about 4,200) and the length of time the camera was in place (nearly two weeks) violates his reasonable expectation of privacy even if a brief or isolated observation would not have.

Garrett essentially argues that the large volume of independently reasonable observations aggregates into an unreasonable level of surveillance that, over time, violated his reasonable expectation of privacy. Although Garrett does not call it by its name, this argument invokes the "mosaic theory." This theory "suggests that the government's collection of numerous discrete data points over time can create an impermissibly invasive picture of an individual's private life, even if any individual data point, standing alone, would not constitute a search." *Green*, 149 F.4th at 746.

Still, the fact that M.T.'s property was recorded through motion detection and night vision in about 4,200 photos over 13 days does not show that Garrett's expectation of privacy was objectively reasonable. Here, as in *Green*, "[t]he camera saw no more—and, except for its elevation, no differently—than the public could have seen all along." 149 F.4th at 746. Contrary to Garrett's assertion, the night-vision technology used here differs from the thermal-imaging disapproved in *Kyllo*. Here, the officer testified that the night vision provided only a view of what could already be seen by somebody standing outside in a public area and did not reveal what was occurring in the house, although the picture taken at night would look different than what the human eye saw. In contrast to *Kyllo*'s thermal imaging, a pole camera is not a form of inaccessible technology that captures details unknowable without physical intrusion.

True, "individuals have a reasonable expectation of privacy in the whole of their physical movements," even if exposed to public view. *Carpenter v. United States*, 585 U.S. 296, 310, 138 S. Ct. 2206, 201 L. Ed. 2d 507 (2018). *Carpenter* concluded that the

20

police's collection of four months' worth of the defendant's cell phone site location information (CSLI) from his wireless carrier constituted a search under the Fourth Amendment because a cellphone "follows its owner beyond public thoroughfares and into private residences, doctor's offices, political headquarters, and other potentially revealing locales," allowing the government to create a comprehensive map of a person's movements with "just the click of a button." 585 U.S. at 310-11. The *Carpenter* Court expressed concern that CSLI "provides an all-encompassing record of the [cell phone] holder's whereabouts" and "an intimate window into a person's life." 585 U.S. at 311. "'[S]ociety's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car for a very long period.' [*Jones*, 400 U.S.] at 430." 585 U.S. at 311.

But this case does not involve the "comprehensive" and retrospective tracking of a person's movements that was problematic in *Carpenter*. And in *Carpenter*, the United States Supreme Court stated that its holding was a narrow one and its decision did not "call into question conventional surveillance techniques and tools, such as security cameras." 585 U.S. at 316. And regardless of whether the pole camera installed near M.T.'s home is a "security camera," it likely falls into the category of "conventional surveillance techniques." And the *Carpenter* Court explicitly left undisturbed the holding in *United States v. Knotts*, 460 U.S. 276, 281-85, 103 S. Ct. 1081, 75 L. Ed. 2d 55 (1983), that using a "rudimentary tracking" device—a beeper—that simply "'augment[ed] visual surveillance'" for discrete intervals was not a search. *Carpenter*, 585 U.S. at 306.

The D.C. Circuit in *Green* discussed pole cameras in relation to the mosaic theory:

"Pole cameras pose a special challenge to the mosaic theory. In one sense, they are among the most common forms of surveillance. They rely on a public, unobstructed vantage point and off-the-shelf technology, not unlike an agent with binoculars perched

21

atop a telephone pole. But unlike that unfortunate agent—who will get bored, blink or need to stretch—a pole camera never looks away. It records everything, 24/7, for weeks or months, even years, preserving everything it sees. By aggregating that data, critics worry, the government can reconstruct not only what happens at a location, but also the patterns and relationships of the individuals who pass through it. Little about the underlying camera technology has changed in recent years but *Carpenter*'s embrace of the mosaic theory has made pole-camera challenges newly relevant to the Fourth Amendment. And as other technologies like artificial intelligence and facial recognition improve, the potential capabilities of ubiquitous cameras may grow exponentially." 149 F.4th at 748.

It then noted that other courts have consistently rejected the expansion of the mosaic theory to include pole cameras:

"Those decisions primarily rely on the continuing vitality of the public-view doctrine as the Supreme Court has articulated it, including *Carpenter*'s reassurance that it did not invalidate the use of traditional surveillance techniques like 'security cameras.' See, e.g., *Tuggle*, 4 F.4th at 525-26 (quoting *Carpenter*, 585 U.S. at 316). They also sometimes note that, even if pole-camera surveillance could violate the Fourth Amendment, the duration of the evidence in their respective cases was not sufficient to establish such a violation. See, e.g., 4 F.4th at 525-26 (18 months permissible but noting the 'obvious line-drawing problem: How much pole camera surveillance is too much?'); *Harry*, 130 F.4th at 348 (50 days); *Hay*, 95 F.4th at 1316-17 (68 days); see also *Carpenter*, 585 U.S. at 322-23 (Kennedy, J., dissenting) (deriding the arbitrariness of the majority's six-day cutoff)." 149 F.4th at 748.

The *Green* court found that "[u]nder the public-view doctrine, Green lacked any objectively reasonable expectation of privacy. And because the observation was both limited and discrete, the mosaic theory does not change that result." 149 F.4th at 749.

We find a material difference between the type of data collection that the United States Supreme Court has disapproved of and the more limited information a pole camera

22

captures—the pole camera is fixed and limited whereas the omnipresent data collection of CSLI is not. The CSLI data and GPS data "provides an all-encompassing record of the holder's whereabouts," that reveal "not only his particular movements, but through [those movements] his 'familial, political, professional, religious, and sexual associations.'" *Carpenter*, 585 U.S. at 311 (quoting *Jones*, 565 U.S. at 415 [Sotomayor, J., concurring]).

And in contrast to *Jones*, officers here did not use a physically trespassory attachment to an object that moves along with the target. See *Jones*, 565 U.S. 400 (holding that attachment of GPS tracking device to vehicle, and subsequent use of that device to monitor vehicle's movements on public streets, was a search within the meaning of the Fourth Amendment). A pole camera depicts only what is in front of it. It does not follow the target around all day to reveal a picture of the target's entire life.

As the *Green* court explained, location-tracking technologies which follow a person broadly but shallowly are different from fixed surveillance tools, which observe narrowly but in greater depth:

> "By contrast, the observational power of a single pole camera is both fixed and limited. The Fourth Amendment 'protects people, not places,' *Katz*, 389 U.S. at 351, so the simple fact that a public-facing camera records a location continuously is not itself constitutionally suspect. The question is what the government in fact learns about an individual from that camera's limited perspective. The information may still be meaningful—agents might see when a person comes and goes, who visits him or how often he mows the lawn—but it would tell them nothing about him outside the frame. The footage, in other words, 'only depict[s] one small part of a much larger whole.' *Tuggle*, 4 F.4th at 524. There is a difference between location-tracking technologies, which follow a person broadly but shallowly, and fixed surveillance tools, which observe narrowly but in greater depth. As an analogy, if an individual's daily patterns were the surface of the ocean, CSLI or GPS data would be a buoy drifting across the water, reporting any contacts along the way. But a pole camera is anchored in place—it might provide

23

complete information about the reef it rests on but say little about the sea beyond." 149 F.4th at 748-49.

All but one of the federal appellate courts that have resolved this issue post-*Carpenter* agree that the kind of surveillance used here is not a search, so is not protected by the Fourth Amendment. See, e.g., *Harry*, 130 F.4th at 348 (use of stationary pole camera to monitor the publicly visible exterior of a target's business for 50 days is not a search under the Fourth Amendment); *United States v. Gregory*, 128 F.4th 1228 (11th Cir. 2025) (defendant lacked reasonable expectation of privacy, for Fourth Amendment purposes, as to front area and back area of his house, which were observed for 10 months, with non-stop recording, from pole cameras installed without search warrant), *cert. denied sub nom. Williamson v. United States*, 2026 WL 795130 (2026); *United States v. Hay*, 95 F.4th 1304, 1313-18 (10th Cir.) (constant video surveillance of defendant's home over several months was not a search since the pole camera could not capture footage of any activity that was not in public view), *cert. denied* 145 S. Ct. 591 (2024); *United States v. House*, 120 F.4th 1313, 1322 (7th Cir. 2024) (law enforcement's warrantless use of a pole camera to observe a home on a short-or long-term basis does not amount to a search under the Fourth Amendment), *cert. denied* 145 S. Ct. 2762 (2025); *United States v. Dennis*, 41 F.4th 732, 740-41 (5th Cir. 2022) (surveillance by pole cameras of front and back of the defendant's house, open to public view, was not a search); *United States v. Trice*, 966 F.3d 506, 518-20 (6th Cir. 2020) (finding no Fourth Amendment violation in installation of camera across the hallway from entrance of defendant's apartment).

The First Circuit, however, deadlocked on the question, with an even number of judges reaching opposite conclusions. *United States v. Moore-Bush*, 36 F.4th 320, 321, 345-47 (1st Cir. 2022) (en banc) (Barron, C.J., Thompson, J., and Kayatta, J., concurring) (reasoning that pole camera footage of a private residence's curtilage over an eight-month period was a search because of its similarities to *Carpenter*: both searches were comprehensive, easy, cheap, efficient, and infeasible to evade).

We adopt the logic used by the majority of federal circuit courts and find that under the facts of record, the pole camera surveillance here did not constitute a search under the Fourth Amendment or section 15. Garrett lacked a reasonable expectation of privacy in the area surveilled. The data collected by the pole camera showed a shard of Garrett's life and not the entire mosaic. And unlike CSLI, pole camera footage does not have the retrospective and comprehensive quality the Court found problematic in *Carpenter*. 585 U.S. at 311-12. The camera was put in place to target Garrett's future actions, and it remained in place for only 13 days. Law enforcement used that technology while occupying a place they were lawfully entitled to be, and to observe only what the public could observe. The district court thus correctly denied Garrett's motions to suppress.

III.    *Does sufficient evidence support Garrett's KORA violation conviction?*

Garrett next argues that insufficient evidence supports his KORA violation conviction because the State presented no evidence that he failed to change his residence during the charged time period of May 5 through May 19, 2023. He admits that evidence showed he had registered a Geary County address in March 2023 and that he was present at M.T.'s house in Riley County between May 5 and May 19. Still, he argues that, under KORA's definition of "reside," his habitation at M.T.'s was not new but ongoing because M.T. testified that Garrett had been at her house for 3 consecutive days or 10 days out of a month sometime during the months of January to April 2023. So, according to him, the State presented no evidence that Garrett failed to register within three business days of changing his residence during the relevant period of May 5 through May 19.

*Standard of Review*

Our standard of review on this issue favors the State.

25

> "When a defendant challenges the sufficiency of the evidence, we review the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt. We do not reweigh evidence, resolve conflicts in the evidence, or pass on the credibility of witnesses." *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024).

"It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed." *State v. Zeiner*, 316 Kan. 346, 350, 515 P.3d 736 (2022).

*Analysis*

Circumstantial evidence can support a conviction of even the greatest offense if the evidence allows a factfinder to find the elements beyond a reasonable doubt. To sufficiently support the conviction, circumstantial evidence need not exclude every other reasonable conclusion. *State v. Barnes*, 320 Kan. 147, 177-78, 563 P.3d 1255 (2025); see also *State v. Valdez*, 316 Kan. 1, 12, 512 P.3d 1125 (2022) (circumstances used to infer guilt must be proved and cannot be inferred or presumed from other circumstances).

The State had the burden to prove that Garrett failed to "register in person upon any commencement, change or termination of residence location . . . within three business days of such commencement, change or termination, to the registering law enforcement agency or agencies where last registered." K.S.A. 22-4905(h). As discussed above, the district court also instructed the jury on the definition of "residence" and "reside," which included locations where the offender stays, sleeps, or maintains his person for 3 or more consecutive days or parts of days, or for 10 or more nonconsecutive days in a 30-day period. See K.S.A. 22-4902(j), (k).

When we view the evidence admitted at trial in the light most favorable to the State, we find sufficient evidence supporting Garrett's conviction of a KORA violation.

26

On May 5, 2023, police investigated a tip that Garrett was living at M.T.'s house in Riley County and saw his car parked there. But when the officer spoke with M.T., she denied that Garrett lived at the house. That day, police installed a camera on a city street pole across the street from the house. Photos from that pole camera admitted at trial show Garrett leaving M.T.'s house and returning to the house at various hours from May 6 to May 19. A spreadsheet was also admitted to show the time and date of each admitted photo.

During that timeframe, Garrett appeared to leave for work early in the morning on many of those days before returning to the house in the afternoon. He also stayed overnight every night for 13 consecutive nights, except on May 19 when the camera was removed. When the police arrested Garrett at the house on May 19, he admitted sleeping at the residence but said he was not registering the address because his girlfriend could get evicted if he did.

Even if we credit M.T.'s testimony that Garrett was not living at her house on May 5, the evidence still establishes that Garrett changed or commenced a new address on or between May 5, 2023, and May 19, 2023, because he stayed and slept at the residence for at least two weeks, and did not register within three business days of doing so. Sufficient evidence thus supports Garrett's conviction.

IV.   *Did the district court err in its order of BIDS attorney fees?*

Lastly, Garrett argues that the district court failed to comply with K.S.A. 22-4513(b) before imposing a BIDS attorney fee in his KORA violation case. He contends that the district court ignored his financial resources and the burden that repayment of the fees would impose before imposing the $2,000 BIDS attorney fee award, so that order should be vacated.

27

The State concedes the district court erred in this way and that we should remand the case for proper consideration of K.S.A. 22-4513(b).

*Preservation*

Garrett did not object to the imposition of this fee before the district court. But "a failure to object to the imposition of BIDS fees has not disallowed parties from raising the issue for the first time on appeal." *State v. Knight*, 44 Kan. App. 2d 666, 687, 241 P.3d 120 (2010) (citing *State v. Robinson*, 281 Kan. 538, 541, 132 P.3d 934 [2006]). So we will consider Garrett's argument.

*Standard of Review*

Whether the district court complied with K.S.A. 22-4513 is a question of statutory interpretation over which an appellate court exercises unlimited review. *State v. Reese*, 300 Kan. 650, 653, 333 P.3d 149 (2014).

An appellate court reviews the amount of attorney fees imposed under K.S.A. 22-4513 for an abuse of discretion. *State v. Hernandez*, 292 Kan. 598, 609, 257 P.3d 767 (2011). A judicial action constitutes an abuse of discretion if (1) it is arbitrary, fanciful, or unreasonable; (2) it is based on an error of law; or (3) it is based on an error of fact. *State v. Younger*, 320 Kan. 98, 137-38, 564 P.3d 744 (2025).

*Analysis*

Before a district court may impose a BIDS attorney fee, it must comply with K.S.A. 22-4513(b), which provides:

"In determining the amount and method of payment of such sum, the court shall take account of the financial resources of the defendant and the nature of the burden that payment of such sum will impose. A defendant who has been required to pay such sum and who is not willfully in default in the payment thereof may at any time petition the court which sentenced the defendant to waive payment of such sum or of any unpaid portion thereof. If it appears to the satisfaction of the court that payment of the amount due will impose manifest hardship on the defendant or the defendant's immediate family, the court may waive payment of all or part of the amount due or modify the method of payment."

To comply, "the sentencing court, at the time of initial assessment, must consider the financial resources of the defendant and the nature of the burden that payment will impose explicitly, stating on the record how those factors have been weighed in the court's decision." *Robinson*, 281 Kan. at 546. The requirement that the court's consideration be explicit preserves the possibility of "meaningful appellate review of whether the court abused its discretion" in setting the amount of attorney fees imposed. 281 Kan. at 546.

Garrett's attorney asked the district court to consider modifying or waiving the BIDS fee because he was unemployed and had only recently begun looking for new employment. The district court judge stated: "I will reduce your BIDS attorney fee to $2,000. The BIDS application fee is $100. You were working and making a good income before this happened. I am gonna reduce it, because I am going to impose a jail sanction of 60 days in the Riley County Jail." The district court made no other inquiry on the record as to Garrett's financial resources or the nature of the burden that payment would impose on him. Nor did the district court state how it weighed those factors in its decision.

The district court thus did not comply with K.S.A. 22-4513(b). We thus vacate the BIDS attorney fee order and remand for further proceedings on the BIDS fee. See *Robinson*, 281 Kan. at 546.

We affirm Garrett's convictions and remand for further proceedings on the BIDS fee.

Affirmed in part, vacated in part, and remanded with directions.